J-A15011-24
J-A15012-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: A.N.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.K., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 253 MDA 2024 |

Appeal from the Decree Entered February 6, 2024
In the Court of Common Pleas of Franklin County Orphans' Court at
No(s): 50-ADOPT-2023

| | | |
|---|---|---|
| IN RE: ADOPTION OF: D.J.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.K., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 254 MDA 2024 |

Appeal from the Decree Entered February 6, 2024
In the Court of Common Pleas of Franklin County Orphans' Court at
No(s): 51-ADOPT-2023

| | | |
|---|---|---|
| IN RE: ADOPTION OF: A.N.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.D., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 339 MDA 2024 |

Appeal from the Decree Entered February 6, 2024
In the Court of Common Pleas of Franklin County Orphans' Court at
No(s): 50-ADOPT-2023

- 1 -

J-A15011-24
J-A15012-24

IN RE: ADOPTION OF: D.J.D., A         :    IN THE SUPERIOR COURT OF
MINOR                                 :         PENNSYLVANIA
                                      :
                                      :
APPEAL OF: D.D., FATHER               :
                                      :
                                      :
                                      :
                                      :    No. 340 MDA 2024

Appeal from the Decree Entered February 6, 2024
In the Court of Common Pleas of Franklin County Orphans' Court at
No(s):  51-ADOPT-2023

BEFORE:   DUBOW, J., BECK, J., and STEVENS, P.J.E.*

MEMORANDUM BY DUBOW, J.:                    **FILED: SEPTEMBER 13, 2024**

In this consolidated appeal, D.D. ("Father") and A.K. ("Mother") appeal from the February 6, 2024 decrees[1] entered in the Franklin County Court of Common Pleas that involuntarily terminated their parental rights to ten-year-old A.N.D. and eight-year-old D.J.D. (collectively, "Children").[2] Upon review, we affirm.

Father and Mother are parents to Children and were never married. In January 2019, the Franklin County Children and Youth Services ("the Agency") became involved with this family due to concerns regarding Children's

---

* Former Justice specially assigned to the Superior Court.

[1] The decrees are dated February 1, 2024, but the prothonotary did not docket the decrees and serve notice until February 6, 2024.

[2] We *sua sponte* consolidate the appeals at Nos. 253 MDA 2024, 254 MDA 2024, 339 MDA 2024, and 340 MDA 2024. Review indicates that these appeals involve related parties and issues. *See* Pa.R.A.P. 513.

- 2 -

sexualized behavior as well as concerns that Children were being sexually abused. At the time, Mother and Father resided separately but shared physical custody of Children. Father lived with Children's paternal grandfather, who was a registered sex offender. Mother lived with her paramour, J.W., III ("Paramour"). Parents refused to agree to a safety plan to keep Children away from potential sexual predators. The Agency obtained emergency custody of Children, and, on July 8, 2019, the court adjudicated Children dependent and placed them in foster care.

From July 2019 through August 2021, Mother participated in court-ordered services with a permanency goal of Reunification. Father initially participated in visitation with Children, but discontinued visitation voluntarily at some point in 2020. In August 2021, Children were reunified with Mother, who was still living with Paramour. From March 2022 to March 2023, Father was incarcerated for a controlled substance Driving Under the Influence conviction as well as a parole violation.

In May 2022, the Agency once again became involved with the family when staff at Children's elementary school noticed that Children were accumulating unusual bruising. On May 20, 2022, the Agency obtained emergency custody of Children and placed them in foster care. On July 1, 2022, upon review of a motion by Children's guardian *ad litem* ("GAL") that asserted visitation with Mother posed a grave threat to Children, the court suspended visitation between Children and Mother. On July 7, 2022, the court adjudicated Children dependent for the second time.

On December 9, 2022, after a hearing, the trial court entered orders finding aggravated circumstances pursuant to 42 Pa.C.S. § 6341(c.1) with respect to Mother and Children, changed Children's permanency goals from Reunification to Adoption, and ordered the Agency to cease reasonable efforts to reunify Children with Mother.[3] Among the evidence considered by the court was testimony from Trisha Goshorn, L.P.N., school nurse; Kathryn Crowell, M.D., member of the Child Protection Team of the Penn State Hershey Children's Hospital and expert in child abuse injuries; as well as the Children's forensic interviews with the Children's Advocacy Center, where Children disclosed that both Mother and Paramour physically abused them. The court found that Mother and Paramour were both perpetrators of physical abuse against Children and additionally found that Mother failed to protect Children from physical abuse.[4] Agency Ex. 11, Aggravated Circumstances Order, at ¶¶ 27, 46. Notably, the court found that A.N.D.'s injuries included bruising to her right and left upper eyelids, her left cheek, the area under her chin, the angle of the right side of her jaw, both of her buttocks, her left lower back, her right outer upper arm, her right outer thigh, her bilaterial inner thighs, and the top of her left foot; abrasions to the right side of her forehead and

---

[3] Mother appealed the aggravated circumstances order, and this Court affirmed; Father appealed the goal change order, and this Court affirmed. **See Interest of A.D.**, 303 A.3d 775 (Pa. Super. 2023) (non-precedential decision); **Interest of A.D.**, 303 A.3d 779 (Pa. Super. 2023) (non-precedential decision).

[4] Mother and Paramour both have criminal charges pending regarding Children's injuries.

left cheek; and a large coalescent bruise to her mons pubis. *Id.* at ¶ 17. Additionally, the court found that D.J.D.'s injuries included bruising to his right and left upper eyelids, the area beneath his right eye, his right forearm, his left anterior thigh, his left and right knees, his right anterior shin, his right anterior thigh, his right outer hip and thigh, his penis, and both of his buttocks; abrasions to his right temple, the right side of his forehead, his left and right knee, his right anterior shin, his outer right lower leg, the outer aspect of his right ankle, his right outer hip and thigh, and both of his buttocks; erythema under the right side of his chin; curvilinear abrasion near his left elbow; and possible bruising on the right side of his scrotum. *Id.* at ¶ 16.

Children are placed in pre-adoptive foster homes. After the second adjudication of dependency, Children returned to the foster home ("Foster Family 1") that they were placed in when they were first adjudicated dependent, but behavioral issues consistent with traumatic abuse required Children to be separated. A.N.D. expressed an interest to live with Foster Family 1's adult son and daughter-in-law ("Foster Family 2"), who agreed to be a placement resource for her. Foster Family 1 and Foster Family 2 live approximately three miles apart, often eat dinner together, and Children see each other almost every day. Children attend the same school and church. Foster Family 1 and Foster Family 2 both take Children to all their medical, dental, and therapy appointments and provide for all their emotional and physical needs.

On October 24, 2023, the Agency filed petitions to terminate Mother and Father's parental rights to Children. The trial court appointed Kristin B. Hamilton, Esq., to serve as Children's GAL and legal counsel after finding that the dual role did not pose a conflict of interest. On November 14, 2023, and December 29, 2023, the trial court held a hearing on the Agency's petitions. The Agency presented testimony from Nicole Weller, Agency Deputy Director; Danae Nowell, A.N.D.'s foster mother; and Patti Nowell, D.J.D.'s foster mother. Father and Mother both testified on their own behalf.

The Agency's witnesses testified in accordance with the above-stated facts. In addition, Ms. Weller testified that she does not believe there is any way that Mother could have visitation with Children without causing severe emotional harm to Children. N.T. TPR Hr'g, 11/14/23, 38. Ms. Weller explained that Children attend the permanency review hearings and get interviewed at a separate location to avoid having contact with Mother during the review hearings. *Id.* at 42-44.

Danae Nowell testified that A.N.D. lives with her, her husband, and her two younger children. Danae explained that A.N.D. is a "great big sister" who "loves her siblings" and is "very motherly at heart and loves to help, loves to play with them [and] takes great pride in being the oldest in our family right now." *Id.* at 56. Danae testified that she and her husband take A.N.D. to all her medical and therapy appointments. She informed the court that A.N.D. is doing well in fourth grade, tries really hard, is social, and is excited to go to school. Danae described her relationship with A.N.D. and stated, "I've known

- 6 -

her for a couple of years and now that she's in our home and being her foster mom, I mean, she's just like our other kids. We love her just like a daughter, and it's been fun to grow that bond and enjoy life with her and be able to teach her things and walk alongside her." *Id.* at 56. Danae testified that she "absolutely" would like to adopt A.N.D. *Id.* at 62.

Patti Nowell testified that D.J.D. has lived in her home with her husband and five of her children for a total of thirty-four months, seventeen months after the first adjudication of dependency and seventeen months additional months after the most recent adjudication of dependency. Patti explained that he has a "great" relationship with the other children in the home, "just like brothers and sisters." *Id.* at 70. Patti informed the court that D.J.D. participates in therapy and medication management and has improved his prior "out of control behaviors." *Id.* at 72. Patti testified that D.J.D. is doing well in first grade and has turned his behaviors around to be one of the best kids in his class. Patti explained that Foster Family 1 and Foster Family 2 are "one family unit" and that they have a shared farm, eat dinner together every night, go on vacation together, and look out for each other. Patti testified that she is "very excited to have [D.J.D. and] he's very excited." *Id.* at 75. Patti testified that she wants to adopt D.J.D. and that "he would be my son just like my other children." *Id.*

Father testified that, when Children were first adjudicated dependent, he participated in an assessment with ABC House and they recommended that he "go get mentally seen about anger and other things" but that he did not

- 7 -

follow up with a parental fitness evaluation. *Id.* at 89. Father testified that he participated in supervised visits with Children for about a year. Father testified that the last time he saw Children "was in 2020 and I told [] ABC House that I was done doing visits because I got tired of lying to my daughter." *Id.* at 91. Father further explained that Children would ask about his parents, their grandparents, and he was told he was not allowed to discuss the allegations against Children's paternal grandfather with Children. Father admitted that he did not attempt to contact Children while he was incarcerated. He testified that when he was released from jail in March 2023, he contacted the Agency three times to arrange visits with Children. Father testified that he "found my religion again," exercises, has new employment, is sober, and complies with parole requirements. *Id.* at 95. Father stated that he moved back in with Mother a week before the hearing. Father testified, "I regret it every day when I walked out and told ABC House I'm not coming back." *Id.* at 96. Father explained, "I love my kids. I want to reunify with them. I messed up. I admit it. I found God. I'm trying to do the best I can in my life." *Id.* at 111.

In her testimony, Mother denied physically abusing Children and denied being aware that Paramour physically abused Children. Mother testified that she currently has a protection from abuse ("PFA") order against Paramour and would be able to protect Children from physical harm if they were reunited with her. Mother stated that she and Children had a bond and that "if given the opportunity, we would still have that bond." N.T. TPR Hr'g, 12/29/24, at

7. Mother testified that she is willing to participate in mental health treatment for her and Children, is not using illegal substances, and can get Children to their required psychiatric appointments, medical appointments, and school activities. Mother further testified that, during the two visits she was allowed to have with Children prior to visits being suspended, they were excited to see her and asked when they could come home. Mother denies that Children are fearful of her. Mother testified that she "should have seen the signs. Yes, I do take blame for that. I should have pushed my kids harder to tell where they got the bruises." *Id.* at 50. Mother testified that she does not know if Paramour abused the kids "[b]ut if the kids are saying that he did and the evidence is there, I have to believe it." *Id.* at 51. Mother stated that Children told their maternal grandmother about the physical abuse by Paramour a month before the Agency removed the Children from the home, but she still did not see the signs because "over discipline was not an issue. . . . I never punished my children. I was too lenient on them[.]" *Id.* at 52. Mother admitted that she has not performed parental duties for the past six months but explained that the Agency did not allow her to perform parental duties or offer her services. Mother further admits that she had been informed on multiple occasions that she could pursue reunification services on her own. Mother believes that it is in Children's best interest "[t]o go home with their parents." *Id.* at 18. Mother testified that she intends to raise the kids with Father and that "[h]e has always been a good dad." *Id.* Mother testified that "[w]e are proceeding as a family." *Id.* at 45.

On February 6, 2024, the trial court terminated Mother and Father's parental rights to Children pursuant to 23 Pa.C.S. §§ 2511(a)(1), (2), (5), (8), and (b).  Mother and Father timely appealed.  Mother, Father, and the trial court all complied with Pa.R.A.P. 1925.

**A.**

Mother raises a sole issue for our review:  "Did the trial court err by determining that the parental rights of [Mother] should be terminated?"  Mother's Br. at 3.

Father raises multiple issues for our review:

1. [] Father argues that the record does not support the trial court's finding that [] Father had "either a settled purpose of relinquishing parental claim" to [Children] or that he has "refused or failed to perform parental duties." Trial Court Opinion page 12. [] Father testified that he attempted to set up supervised visits and enroll in other services but was advised by the ABC House that he could not without a referral from [the Agency].

2. [] Father argues that the record does not support the trial court's finding that his "repeated and continued incapacity, abuse, neglect, or refusal" caused [Children] "to be without essential parental care, control or subsistence necessary for their physical or mental wellbeing and the conditions and causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by" [] Father.  Trial Court Opinion page 12.  It is uncontroverted that [] Father was not the perpetrator of the alleged abuse against [Children]. The record is void of any evidence that [] Father cannot or will not be able to provide safe and stable housing for [Children] and meet [Children]'s physical and emotional needs.

3. [] Father argues that the record does not support the trial court's finding that "the conditions which led to the removal of [C]hildren from Mother continue to exist; nothing suggests any possible services which would make reunification safe for

- 10 -

[C]hildren." Trial Court Opinion page 10. The record is void of any evidence that [] Father has never lived independently, cannot provide safe housing for [Children], and that the only people that [] Father has lived with were unsuitable for the [C]hildren. [] Father also intends to argue that he testified that he is willing to complete any services necessary to facilitate reunification and that this could be achieved in way such that it is safe for [Children].

4. [] Father argues that the record does not support the trial court's finding that "there is no present bond between the Child[ren] and either parent" and that it would be "destabilizing for Father to suddenly take-on a role which he has not performed." Trial Court Opinion page 11. [] Father expressly denies that there was any evidence that showed that there is no bond between him and [Children]. Further, [] Father testified that prior to his incarceration and [Children]'s first placement into foster care, the parties shared physical custody of [C]hildren. Father intends to argue that it is not [in] the [Children]'s best interests that his parental rights be terminated

Father's Br. at 5-7.

**B.**

In cases involving the involuntary termination of parental rights, this Court's review is limited to determining whether the trial court's conclusion is supported by competent evidence. *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021). When we review a trial court's decision to grant or deny a petition to involuntarily terminate parental rights, we must accept the findings of fact and credibility determinations of the trial court if the record supports them. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* (citation omitted). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial

- 11 -

court's decision, the decree must stand." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (citation omitted). We may not reverse merely because the record could support a different result. *T.S.M.*, 71 A.3d at 267. We give great deference to the trial courts "that often have first-hand observations of the parties spanning multiple hearings." *Id.* Moreover, "[t]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

It is axiomatic that "[p]arents enjoy a fundamental right to make decisions regarding the care, custody and control of their children. It cannot be denied that significant and permanent consequences for both the parent and child can follow the termination of parental rights, as there is an undeniable importance in a child's relationship with a biological parent." *L.A.K.*, 265 A.3d at 591 (internal citations omitted). Accordingly, "[i]n recognition of the gravity attendant to the termination of parental rights, the moving party must establish the statutory grounds by clear and convincing evidence; that is, evidence that is so clear, direct, weighty and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* at 592 (citations and quotation marks omitted).

Section 2511 of the Adoption Act, 23 Pa.C.S. § 2511, governs termination of parental rights, and requires a bifurcated analysis. "Initially, the focus is on the conduct of the parent." *In re Adoption of A.C.*, 162 A.3d 1123, 1128 (Pa. Super. 2017) (citation omitted). As discussed above, "[t]he party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." *Id.* (citation omitted). If the court determines that the parent's conduct warrants termination of his or her parental rights, the court then engages in "the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." *Id.* (citation omitted). Notably, we need only agree with the court's decision as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm the termination of parental rights. *In re K.Z.S.*, 946 A.2d 753, 758 (Pa. Super. 2008). With regards to Mother, we concentrate our analysis on Section 2511(a)(2). With regards to Father, we concentrate our analysis on Section 2511(a)(1).

## C.

As stated above, with regards to Mother, we concentrate our analysis on Section 2511(a)(2). Section 2511(a)(2) provides for termination of parental rights where the petitioner demonstrates by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental

- 13 -

care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." 23 Pa.C.S. § 2511(a)(2); ***In re Adoption of S.P.***, 47 A.3d 817, 827 (Pa. 2012). The grounds for termination of parental rights under Section 2511(a)(2) due to parental incapacity are not limited to affirmative misconduct; those grounds may also include acts of refusal as well as incapacity to perform parental duties. ***In re Adoption of C.D.R.***, 111 A.3d 1212, 1216 (Pa. Super. 2015), *abrogated on other grounds by **In re K.T.***, 296 A.3d 1085 (Pa. 2023). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." ***In re C.M.K.***, 203 A.3d 258, 262 (Pa. Super. 2019). Notably, a "parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." ***In re Z.P.***, 994 A.2d 1108, 1118 (Pa. Super. 2010).

Finally, sincere efforts to perform parental duties may still be insufficient to remedy an incapacity. ***Id.*** at 1117. This is because subsection (a)(2) "emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being[,]" especially "where disruption of the family has already occurred and there is no reasonable prospect for reuniting it." ***Id.*** (citation omitted).

**D.**

The crux of Mother's argument is that she was limited in her ability to provide essential parental care to Children because of the trial court's no-visitation orders and because the Agency was not required to provide reunification services. Mother's Br. at 7-9. Mother admits that she failed to provide parental care but blames the court and the Agency for refusing her the opportunity to do so. *Id.* Mother emphasizes that "the [c]ourt acknowledged that Mother was not the person who physically abused [Children], but took exception to the fact that Mother was 'solely responsible for the safety of [C]hildren' at the time they were harmed." *Id.* at 10 (citing Decree, 2/6/23, at 8). Mother argues that the trial court failed to consider that she has obtained a PFA against Paramour, that she has obtained appropriate housing and employment, and that she is willing and able to participate in any reunification counseling that the Agency provides. *Id.* at 10-11. Mother's arguments merit no relief.

First and foremost, Mother mischaracterizes the trial court's findings regarding abuse, which renders her argument disingenuous at best. In its February 6, 2023 decree, the trial court emphasized that the Agency presented a forensic pediatric evaluation as well as Children's forensic interviews to support the abuse allegations, and unequivocally made a finding that Mother was the perpetrator of child abuse against Children:

> Here, the Juvenile Court made a finding that Mother is a perpetrator of child abuse against the Child and her brother in May 2022. The abuse was physical, as graphically described in the Juvenile Court's findings. The Juvenile Court also made a finding

- 15 -

that Mother's paramour is a perpetrator of child abuse against the Child and her brother. There is no reason to discount the findings of the Juvenile Court, especially considering they have been upheld on appeal.

Decree at 7-8. The trial court made an additional finding that Mother was **also** responsible for protecting Children from Paramour:

Mother was the sole parent with custody in May of 2022, and therefore was solely responsible for the safety of her children. As Mother takes no responsibility, either directly for the abuse, or indirectly for failing to prevent the abuse, nothing prevents recurrence should the children be returned to her.

*Id.* The trial court's finding that Mother was likewise responsible for protecting her Children from Paramour's physical abuse does **not** negate the trial court's clear finding that Mother was directly responsible for perpetrating child abuse against Children.

In ***In re A.D.***, 93 A.3d 888 (Pa. Super. 2014), an analogous case, a father was ordered to have no-contact with the child that he abused and, in affirming the termination of his parental rights pursuant to Section 2511(a)(2), this Court concluded, "parental incapacity caused by a no-contact order is not only relevant to a court's conclusion that grounds for termination exist under § 2511(a)(2), but where, as here, the order is required to protect the children from further [] abuse at the hands of the excluded parent, we find that it is dispositive." ***Id.*** at 897. Instantly, we find ***A.D.*** to be instructive.

Here, the trial court emphasized the exceptional nature of this case and the fact that the court prohibited all contact between Mother and Children and found Ms. Weller's testimony credible that there was no way to ensure

Children's safety if they were to have contact with Mother. The court opined,
"[t]he Deputy Director of [the Agency] testified that this case . . . is the only
case where, in her experience, the Juvenile Court prohibited all contact
between a parent and a child. The Deputy Director also testified that there
was no way to ensure the emotional safety of [C]hildren if allowed contact
with Mother." Decree at 7. The court further emphasized that "Mother has
not undertaken any form [of] treatment, such as anger-management classes,
which could remediate the potential for repeated abuse." *Id.*

The trial court concluded that Mother's physical abuse of Children, the
resulting no-contact order, Mother's failure to take responsibility for that
abuse, and Mother's failure to engage in services to remediate the potential
for repeated abuse has prevented Mother from providing essential parental
care to Child. *Id.* at 7-8. While Mother argues that the no-contact order was
to blame for her inability to parent Children, the no-contact order was in place
to ensure Children's safety. Pursuant to *A.D.*, the no-contact order was not
only relevant to the trial court's analysis but is dispositive. Our review of the
record supports the trial court's findings, and we decline to reweigh the
evidence or usurp the trial court's credibility determinations.

**E.**

With regards to Father, we concentrate our analysis on Section
2511(a)(1), which provides that the trial court may terminate parental rights
if the Petitioner establishes that "[t]he parent by conduct continuing for a
period of at least six months immediately preceding the filing of the petition

either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." 23 Pa.C.S. § 2511(a)(1). The focus of involuntary termination proceedings is on the conduct of the parent and whether that conduct justifies a termination of parental rights. *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa. Super. 2001). Although the statute focuses on an analysis of the six months immediately preceding the filing of the petition, the court must consider the whole history of a given case and may consider a parent's inaction before the six-month statutory provision. *In re K.Z.S.*, 946 A.2d 753, 758 (Pa. Super. 2008). "Although courts are to avoid the mechanical application of the Adoption Act, we may not ignore that the General Assembly has drawn focus to the six months immediately preceding the filing of the termination petition [and] the most critical period for evaluation is the six months immediately preceding the filing of the termination petition." *L.A.K.*, 265 A.3d at 592.

Our Supreme Court has repeatedly defined "parental duties" in general as the affirmative obligation to provide consistently for the physical and emotional needs of a child:

> Parental duties are not defined in the Adoption Act, but our courts long have interpreted parental duties in relation to the needs of a child, such as love, protection, guidance and support. Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship. The roster of such positive actions undoubtedly includes communication and association. The performance of parental duties requires that a parent exert himself to take and maintain a place of importance in the child's life. Fortitude is required, as a parent must act with reasonable firmness to overcome obstacles that stand in the way of

preserving a parent-child relationship and may not wait for a more suitable time to perform parental responsibilities.

*Id.* (internal citations and quotation marks omitted).

It is well-settled that "a parent's efforts are always considered in light of existing circumstances." *Id.* (citations and internal quotation marks omitted). "To that end, even where the evidence clearly establishes a parent has failed to perform affirmative parental duties for a period in excess of six months as required by Section 2511(a)(1), the court must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination of parental rights." *Id.* at 593 (citations and internal quotation marks omitted).

Our Supreme Court has explained:

Consideration of the totality of the circumstances includes evaluation of the following: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between the parent and child, if any, including any efforts made by the parent to reestablish contact with the child; and (3) the effect that termination of parental rights would have on the child pursuant to Section 2511(b). . . . It is within this framework that a court determines whether a parent has faced barriers that prevented the parent from maintaining the parent-child relationship. What constitutes a "barrier" in the context of a Section 2511(a)(1) analysis is a finding within the discretion of the trial court, and what may constitute a barrier necessarily will vary with the circumstances of each case. In some instances, obstructive behavior by the child's custodian presents a barrier to the parent's ability to perform parental duties, which mitigates the parent's failure to maintain the parent-child relationship.

*Id.* at 593. Notably, "a parent's efforts to enforce his or her legal custody rights unquestionably establishes the affirmative performance of a positive

- 19 -

parental duty, and that when such action is taken in the face of a custodial parent's efforts to thwart access to the child, the attempts to enforce custodial rights provide evidence that is highly relevant to the question of whether the requirements of Section 2511(a)(1) have been met." *Id.* at 594.

**F.**

With respect to Section 2511(a)(1), Father avers that the record is void of evidence that Father had a settled purpose of relinquishing parental claim to Children or that he refused to perform parental duties. Father's Br. at 12. Father argues that he and Mother shared custody of Children for approximately seven months prior to them being placed in foster care for the first time and, after they were placed, Father attended supervised visits for approximately one year. *Id.* at 12. Father further argues that, once Children were returned to Mother's care in 2022, Father wanted to have shared custody and/or parental involvement with Children, but Mother refused. *Id.* at 13. Finally, Father asserts that once he was released from incarceration in March 2023, he attempted to set up visitation with Children three times, demonstrating his commitment to be a parent to Children. *Id.* at 14-15. Father's arguments lack merit.

In terminating Father's parental rights pursuant to Section 2511(a)(1), the trial court placed great weight on the fact that Father has not had contact with Children since 2020, and that he voluntarily ceased visitation with them. The trial court opined:

Father has not visited or otherwise communicated with [C]hildren since 2020. Although Father has been incarcerated off and on, incarceration was not the reason for the lack of contact. Rather, Father testified that he told ABC House that he was "done doing visits". Father testified on cross examination that he had made a conscious decision to "disappear" so that Mother could get [C]hildren out of foster care during their first dependency. After [C]hildren were returned to Mother and the dependency was terminated, there is no evidence that Father interacted with [C]hildren in any way. During Father's incarceration, Father did not attempt to communicate with [C]hildren by sending gifts or letters, nor request any form of visitation. Father admitted that he had the ability to conduct video conferences with [] Child[ren] while he was incarcerated in the county jail; he offered no explanation for his lack of doing so.

Father's testimony regarding his disappearing from [C]hildren's lives in 2020 is clear and convincing evidence of a settled purpose to relinquish his parental claims. Additionally, Father has not performed parental duties, whether by refusal or failure, in almost three years.

Decree at 9.

Our review of the record supports the trial court's findings, and we decline to reweigh the evidence or usurp the trial court's credibility determinations. Father's own testimony is compelling. By his own admission, he voluntarily ceased visitation with Children and did not attempt to communicate with Children while he was incarcerated. At the time of the hearing, Father had not seen Children in over three years. Moreover, Father's attempt to set up visitation three times once released from incarceration does not fulfill his affirmative obligation to provide for the physical and emotional needs of Children on a consistent basis. Accordingly, we find no abuse of discretion in the trial court's conclusion that Father had refused to perform parental duties.

- 21 -

**G.**

With respect to Section 2511(b), our analysis focuses on the effect that terminating the parental bond will have on the child. This Court reviews "whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010). It is well settled that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005).

"One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond" that the child has with the parent, with close attention paid to the effect on the child of permanently severing any such bond." *In re Adoption of N.N.H.*, 197 A.3d 777, 783 (Pa Super. 2018) (citation omitted). The fact that a child has a bond with a parent does not preclude the termination of parental rights. *A.D.*, 93 A.3d at 897. Rather, the trial court must examine the depth of the bond to determine whether the bond is so meaningful to the child that its termination would destroy an existing, necessary, and beneficial relationship. *Id.* at 898. Moreover, the trial court may consider intangibles, such as the love, comfort, security, and stability the child might have with the adoptive resource. *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011). Ultimately, the concern is the needs and welfare of the child. *Z.P.*, 994 A.2d at 1121.

Mother and Father both aver that the trial court erred when the court found that termination of parental rights was in Children's best interest. Mother's Br. at 12-13; Father's Br. at 19-20. Both parents argue that the record does not support the trial court's conclusion that there is no bond between Children and parents. Mother's Br. at 12-13; Father's Br. at 19. We disagree.

While both parents testified that they had a bond with Children, the trial court did not find this testimony to be credible. Indeed, in this case, the trial court concluded that actions speak louder than words. In finding that there was no bond between parents and Children, the court placed great weight on the fact that Father has been absent from Children's lives for over three years and that Children suffered physical abuse and ongoing trauma at the hands of Mother. Further, the trial court emphasized Children's wishes to not have any contact with Mother or Father and noted that Children do not even want to be in the same building as Mother. The court opined:

> There is no present bond between [Children][5] and either parent. [Children have] not asked to contact either Mother or Father. Rather, due to observed distress, during permanency review hearings [C]hildren are interviewed in a separate building from Mother to prevent accidental contact. Although Father's visitation was never suspended by the [c]ourt, Father has not sought any form of visitation in the Juvenile Court. Neither parent has sent letters or gifts to [C]hildren, in an effort to maintain a relationship.
>
> Therefore, considering that: 1) [Children]'s developmental, emotional, and physical needs are met by [their] Foster

---

[5] The trial court issued identical findings for A.N.D. and D.J.D. Accordingly, we have changed references from "Child" to "Children."

- 23 -

Famil[ies]; 2) Father has been absent for the most-recent third of [Children]'s life and it would be destabilizing for Father to suddenly take-on a role which he has not performed; 3) Mother had a chance to remediate her deficiencies as a parent and it led to [Children] suffering traumatic abuse; and 4) there is no evidence of a bond between [Children] and either parent, it is in the best interest of [Children] that Mother and Father's parental rights be terminated.

Decree at 11.

The record supports the trial court's findings and, thus, we discern no abuse of discretion. As always, we decline to reweigh the evidence or usurp the trial court's credibility findings.

**H.**

In conclusion, our review of the record supports the trial court's findings. We discern no error of law or abuse of discretion with respect to the trial court's conclusion that the Agency presented clear and convincing evidence to terminate Mother's parental rights pursuant to Section 2511(a)(2) and (b) and Father's parental rights pursuant to Section 2511(a)(1) and (b). In light of our disposition, we decline to address Mother and Father's arguments as they relate to other subsections of Section 2511.

Decrees affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/13/2024